Good morning, Your Honor. Michael Twersky from Fox Rothschild on behalf of the plaintiffs and the appellants here. I'd like to reserve three minutes for rebuttal if that's acceptable to the court. Yes. Thank you. In January 2022, California State University amended its non-discrimination policy to include the word cast as a protected status. The issue in this case is whether the inclusion of that word violates the constitutional rights of the plaintiffs. Plaintiffs argued below and again here that the term cast in the policy violates the due process clause because it's unconstitutionally vague and they also argued that the term cast in the policy violated both the establishment and free exercises clauses of the First Amendment. The trial court initially ruled in granting defendants motion for judgment on the pleadings that plaintiffs failed to assert a claim under the free exercise clause. The trial court subsequently, in a trial on the briefs, granted judgment for defendant on the establishment clause and due process claims. As to the due process claim, the court determined that plaintiffs lacked standing and as to the establishment clause claim, the court found that plaintiffs had standing but failed on the merits. Respectfully, as our briefing discusses, we believe the court erred in those decisions. Just as an initial matter, plaintiffs wouldn't be here if the policy used neutral terms like social status or economic status instead of cast. But the use of the word cast and the evidence of record on how that came about is the reason plaintiffs brought this loss. The only evidence of record... Without regard to the comments by some of the commentators to the task force committee, what is it about the word cast in the policy that you allege to be discriminatory? Discriminatory under the establishment clause or vague under the due process clause? Either. I mean, the problem I'm having with your theory here is that because cast is not defined, I don't see any government comment one way or the other, other than to forbid discrimination on the basis of cast without defining it. And your clients allege that as they believe in their Hindu faith, there is no discrimination with regard to cast. So, I'm grasping here for help and trying to determine what is it about the word cast that you think amounts to some kind of endorsement or explication of what cast means. Yes. Thank you, Your Honor. The language itself, the word itself, is not dispositive. As the Supreme Court found in Lukumi, facial neutrality is not determinative. And I'll quote from that case. It's at page 534 of the opinion. Quote, the free exercise clause, like the establishment clause, extends beyond facial discrimination. The clause forbids subtle departures from neutrality and converts suppression of particular religious beliefs. So, we need to look beyond the term, Your Honor. And so, how we do that, exactly as the court did in Lukumi, is to look at the circumstances surrounding the enactment of the policy, the change by adding cast to the policy. And the only evidence of record that CSU relied on in adding cast are the resolutions from the California Faculty Association, the CFA, California Student Association, CSSA, and the Associated Students, Inc., which is a student association, California Polytechnic State University. I thought there were 20 commentators, and you've listed three. Yes, Your Honor. We have no idea, Your Honor, because there is nothing in the record, and there was nothing produced in discovery as to the position that those quote-unquote stakeholders took as to the addition of cast to the policy. So, when the... Counsel, even if we were dealing with the enactment of a legislative statute, we would look to the committee report. And as I understand it, all we have here is a task force that made a recommendation to the Chancellor to add the word cast. The fact that there were three commentators who basically endorsed the addition of the word cast because people can be discriminated on that basis isn't really part of what I would consider to be the legislative history in the same way that we would look at a committee report, is it? I would disagree respectfully, Your Honor. If you look at Lukumi, what Lukumi relied on were statements that were made by members of the public. And it's not just that these were comments made by stakeholders. The record indicates that those resolutions by CFA, CSSA, and ASI were the impetus for adding cast to the policy. And that's exactly what... Did CSU ever say we're adopting those statements or we're endorsing those statements or incorporating them by reference in any way? I mean, they didn't officially say they agreed with those statements, did they? There's nothing in the record of that, Your Honor. But there's also, that's the only evidence in the record that shows what the impetus was for this. There's nothing else to base this on. What the testimony of the defendant's designee is, is that cast discrimination became an issue for CSU through the CFA and CSSA resolutions. She testified... Just bear with me one moment. She testified that CSU was hearing about cast, decided it was, quote-unquote, a real thing, and that they were going to, quote, take it seriously and prohibit it. That's in the record at 3 ER 529. I don't think under Lukumi, you need an adoption of that statement. This is... We don't have any evidence one way or the other of what the reason CSU adopted the policy other than Ms. Anson's testimony. That's the only information we have, that they heard about cast through the CS, through the resolutions, and that as a result of that, they were going to do something, take it seriously and prohibit it. Now, the question... But counsel, counsel, if the policy prohibits discrimination on the basis of cast, and your clients believe that their faith prohibits discrimination on the basis of cast, then where's the conflict here that causes injury to your clients? Yes, Your Honor. The injury here is the self-censorship. Professor Kumar testified that he no longer celebrates, or rather, he's reluctant to celebrate holidays such as Diwali, which is considered by some or has been branded by some as a casteist holiday. He doesn't discuss Hindu texts anymore for the very same reason. The question... Can I ask you, what makes that reaction rational? So, I mean, what the policy prohibits is harassment and discrimination, actually hurting someone's job prospects. What makes it rational for him to be worried about celebrating those holidays? Your Honor, I would say if you look at... Again, in the record, if you look at... There was a board of trustees meeting in January, 2022, after the policy was enacted. And it was sort of an open forum where students and faculty and anyone really could ask questions or raise issues about the policy. Now, that occurred after the policy was amended to include caste. So that meeting had nothing to do with why caste was added or what caste meant when it was added. There are statements, and that's in the record at 5 S.E.R. 1337 to 1356. And when you at those comments, there are comments that talk about Diwali being a casteist holiday. So the issue... And this goes back to dry house. It's a standing issue, Your Honor, that was discussed in dry house. So, counsel, on this point, do you agree that someone who engages in self-censorship in this context only has standing if they have an actual and well-founded fear that the provision, in this case, not a law, but the policy will be enforced against them? I don't know if I would use that. I think the language in dry house is whether the conduct is arguably prescribed by the law. And the... Well, I'm talking specifically about self-censorship, and I'm talking about Virginia versus American booksellers. So you would quarrel with there has to be an actual and well-founded fear that the law... I wouldn't quarrel with that. I think there has to be a well-founded fear. And to me, that goes to Judge Friedland's question, which is no one, I think, can dispute. If your client says he has this fear, no one can dispute that it's a subjective fear. But I don't see anything here that would indicate to me that that subjective fear of enforcement is well-founded. And so once you continue, but to me, on this point, I would want to hear what you think in the record shows that the subjective fear of your client of enforcement against him is well-founded. Okay. Thank you, Your Honor. So there's two things. One, I would point to that open forum that I've already cited to the record as to people in the CSU community's views on, for example, celebration of Diwali. The other thing I would say is we sort of have two different sort of questions, maybe same side of the coin. Whether he has a legitimate fear that he's going to be accused of discrimination or harassment under the policy, and whether the policy is going to be enforced against him. Sort of two separate things. With regard to whether the policy is going to be enforced against him, as this court has held that the failure to disavow enforcement is sufficient grounds to provide that well-founded fear. Now, so the policy hasn't been disavowed. In fact, quite the opposite. As Ms. Anson testified, CSU is going to do something about this perceived problem with caste. Well, if someone actually fires someone because of their caste, then yes. But I don't understand at all the idea that celebrating a holiday amounts to what counts as harassment or discrimination under the policy. Well, again, I would refer the court to the open forum where people in the CSU community spoke directly about that issue. I mean, someone might wear a t-shirt that says something very offensive, and maybe they would say that t-shirt shows something offensive. But that doesn't mean the person wearing the t-shirt fired anyone or harassed anyone. So I'm just still missing the link. Can you explain what about the forum you're talking about suggested that attending a holiday celebration would count as either harassment or discrimination under the policy? Sure. So let's take the celebration of a holiday or discussing Hindu texts, right? If Professor Kumar is in a class and he wants to talk about Diwali or he wants to talk about one of the Hindu texts that he wants to just discuss his religion, and there's a student in the class that believes that that's casteist behavior because they don't believe, and again, I would say to the court, just look at this open forum. But there are people that believe that that sort of behavior is casteist, and that could be seen as harassing conduct, not discriminatory, not losing a job. But if a professor starts talking about a holiday that a student believes is casteist, the problem that we have is that student can then make a claim. Would that similarly be true if, for example, a professor were giving a historical lecture on the Crusades and talked about some of the alleged bad actions that the Crusaders performed in the Middle East, and a student complained that this demonstrated anti-Catholic or anti-Christian conduct? Would that work too? I'm sorry, Your Honor. Go ahead. Well, I don't think it's analogous because there's nothing in the policy that talks about, that is anything tied to, just religion is a neutral term. It's not related to Catholicism. It's not related to Judaism. It's not related to Hinduism. This is different. The policy includes the term caste. And I would say like the words in Lukumi with ritual and sacrifice, those are both secular and religious terms, just like kosher in the Comat case. So one of the problems we have here is what does, and Your Honor, I would say your example is an apt one. What does we know from case law, what discrimination based on religion looks like? What does discrimination based on caste look like? So this gets to the vagueness issue in the statute, in the policy. We don't know what discrimination looks like based on caste because we don't know what caste means. If you just take the dictionary definition of caste, for example, the old English dictionary, or the Oxford English Dictionary defines caste many different ways. So one way is each of the hereditary classes of Hindu society distinguished by relative degrees of ritual purity or pollution and of social status. So if we take that definition, and again, that's the dictionary, it's one of the dictionary definitions, we believe that would violate the establishment clause because it clearly ties this into Hinduism. Now, if, and I want to, sorry, Your Honor. Counsel, would it matter whether or not the professor was teaching a comparative religion class? Would he be permitted to discuss the history of caste discrimination as it might have been in past times? I think, Your Honor, the answer to that question is yes, based on Torlakson, but that's not the conduct that we're alleging is the problem here. Let me sort of, let me, so here's the problem. I'm struggling with trying to find endorsement here, and I just don't see where the neutral word caste without a definition in the policy is inherently discriminatory. Well, I would argue, Your Honor, I don't think endorsement is the test after Kennedy, but the problem is the use of the word caste and the fact that it's not defined. That's where we get into the problem. What does caste discrimination look like? How does somebody govern their lives so that they don't discriminate based on caste? So can I just ask this again, because I just want to make sure that if you have a specific example that I understand it. So the policy says that an adverse action is something that has a substantial and material adverse effect on the complainant's ability to participate in a university program, activity, or employment. And then there's harassment, which is unwelcome verbal, nonverbal, or physical conduct, epithets and slurs that creates this bad environment. So what, can you just give me, if there is something your client is refraining from doing because he's worried that it would be one of these things, can you explain what it is? Yes, Your Honor, and it's, again, it's in our papers. If there are people at the university who believe Diwali is a casteist holiday, okay, and Professor Kumar is in class and he starts discussing, now I think, I think Professor Kumar is an electrical engineering professor. And if he starts, would have nothing to do with his course, but in the way professors sometimes talk about things outside of the subject matter, he discusses Diwali, where he discusses something in a Hindu text. And there's a student in the class who believes that that is casteist behavior. And he feels, he or she feels that I'm being harassed. This professor is talking about something that is casteist and is unacceptable to me, to my beliefs. Then that harassment, that is, that is, that it would be an allegation of harassment that would be brought under the policy. We don't know. So if someone, if someone is Catholic and says, you know, I celebrated ex-Catholic holiday and someone in the class is gay, could they say this is harassment? I just don't understand how that's plausible. I, I, I, I, and again, I think there's a difference. If, if the policy had said, the policy clearly can, can anti-discrimination policies based on sexual orientation, completely acceptable. But if instead of using the term sexual orientation, CSU decided to use a different term. And the policy said something like, you shall not discriminate against one who uncovers the nakedness of another of the same sex. Okay, that's a biblical term. That would be different, because it is not a neutral term. So when we're dealing with terms that aren't neutral, or that have multiple meanings, like caste does, we have to look behind the curtain, so to speak, to decide what was the motivation, what was the impetus for passing this policy? Counsel, I'm not, I'm not sure that this would really matter to my analysis, but did your client testify in his deposition, that in teaching electrical engineering, he typically talked about Diwali? No, Your Honor. He did testify that he's, that he refrains from talking about Diwali or other holidays that are branded as casteist, and that he also doesn't talk about sacred texts. In his, in his electrical engineering teaching? There were, I don't think there was that level of specificity, Your Honor. But it, it doesn't have to be in the classroom. It could be anywhere on campus. I mean, if he sees a student in his class, or he sees a student not in his class, and he wants to talk about it, we're in the same situation. I mean, it's exactly the same. It doesn't matter whether, for purposes of the, of this litigation, and purposes of the constitutional analysis, it doesn't matter whether he's in the classroom discussing it, or grabbing lunch with a bunch of students to discuss. The same would hold true, as it would for any of the other categories of discrimination. We've taken you over your time, so I think we should cut you off. I'll still give you three minutes for rebuttal, but let's hear from the other side. Thank you, Your Honor. Oh, you're muted, I think. Good morning. Good morning, Your Honors, and may it please the court. Jeff Michalowski for Chancellor Kester, the California State University defendant in this case. I think it's important to note from the outset that this case comes to this court after a full evidentiary record, and completion of full fact discovery and expert discovery on both sides. And the district court below made a series of factual findings that there was no hostility towards religion, no targeting of Hinduism, and it found as well that plaintiffs didn't have standing on some of their claims. And there are multiple ways here that the court can and should affirm. It can do so based on standing, and as we've argued, that can dispose of the entirety of the case. Or if the court disagrees with us on standing, it can still find in CSU's favor on the merits of the constitutional claims. So I want to start by focusing in on the question of whether there was any evidence of hostility toward religion, because that's an overarching question that goes to several of the claims. There was contention that there was such hostility, that I think in the remarks as well as in the briefing, but that's not what the district court found based on the evidentiary record. That's a factual issue, and that district court's findings as to hostility is reviewed under a substantial evidence standard. So where is the evidence of hostility by any decision maker at CSU? As the questions have suggested, there's no evidence of hostility by the chancellor, by anyone in the Title IX working group that made the recommendation. Plaintiff is really only relying on resolutions by entirely separate entities, the California Faculty Association, which is essentially a labor union of faculty members that's often adverse to the university on issues, and student groups as well. But the question has to be whether there's evidence of animus by the chancellor, and there's nothing there. So there's a default of evidence, but even more than that, your honors, there's affirmative evidence by the chancellor's designee, Laura Anson, she's in charge of Title IX, that the policy was intended to be totally neutral towards religion. She testified, our policy is religion neutral. We don't associate caste with any specific religion. We also have her declaration to ER388. She says the intent behind the policy was not to target any particular religion or religion more generally. The district court was entitled to rely on this as evidence of not just a lack of hostility towards religion, but of affirmative neutrality. So in that sense, on the merits, it's actually a fairly simple case because we have evidence of neutrality, which disposes of the great bulk of the claims. For the establishment clause, whose perspective do we use to evaluate neutrality? If someone would read this and think, oh, it says caste, that must be talking about Hinduism. Is that relevant? That's an interesting question. And of course, the Kennedy versus Bremerton decision says that we're not going to have this, the lemon test anymore. So I do think we still need to look at that. When we're asking the question of whether there's hostility towards religion, that can't be a purely subjective question, right? There needs to be at least an objective element to it. So it's not just what the plaintiff sees there. I think there needs to be an objective component to that test. And here, objectively, we have a word, caste, that doesn't carry with it any hostility towards religion. And so for the establishment clause on the merits, we, again, fail at the very outset because there's no evidence of hostility. We would then turn to the history and tradition prong. And on that front, plaintiff would fail as well because they didn't come forward with any expert historical evidence or any evidence that would suggest that this sort of policy would be historically disfavored. So for standing for the establishment clause, is it enough that it's plausible that someone might think caste is related to Hinduism and so asserts an injury that the government is creating stigma against my religion? We have, I think it's from the Catholic League decision, we have some discussion of there being, there needs to be evidence of stigma and there needs to be evidence that the plaintiff is a member of the allegedly stigmatized community. And the problem here is that there is no such evidence. This case went to trial. Plaintiff had an opportunity to put on declarations indicating that this policy stigmatized me. But what we see from the evidence that's actually been presented is that the concern was stigma on account of these resolutions that were passed by student organizations and faculty organizations. So we don't have any evidence, not by, plaintiffs didn't put in a declaration at trial, right? So there's no evidence that they were stigmatized by this policy. We also have to look at causation and redressability. And this court, any court can't do anything to redress allegedly stigmatizing comments that were made by private student organizations or by faculty organizations. I mean, usually there's some sort of lower threshold for what is required for standing than what's required for the merits. So I don't know if you're arguing that for the Establishment Clause, they are exactly the same. It would seem to me that if there's a lower threshold for standing, the plaintiff probably does meet that lower threshold for the Establishment Clause because it's not crazy to think that caste has to do with Hinduism and that there's some sort of stigma. I think you have a lot of arguments that on the merits, they haven't shown that this policy actually does what they fear, but I'm struggling with why they don't have standing to try to make this argument. I understand that concern. And I think the key to this analysis is the procedural posture of the case, which is that this case went to trial. At trial, so standing is a concept where the plaintiff's burden advances throughout the case. At the pleading stage, all they have to do is allege facts sufficient to support standing. So they could allege that stigma and that could be sufficient. Maybe I'm confused about where the testimony, I know I read testimony, maybe it was a deposition and not at trial, so maybe correct me, but didn't the plaintiff testify in some relevant way in this proceeding about fear of stigma, which would be the same as the allegations in the complaint? And I'm not sure there was a lack of proof of what the allegations were. Was there in terms of the testimony? There was testimony that I can recall. I don't know if the term stigma was used. There was certainly a reference to fear of ridicule. The question though is, is there any reasonable fear of ridicule by the relevant defendant, by CSU? As your honor noted, there could be private actors, students, other faculty members who are critical of the plaintiffs. There's no evidence of that happening, but if that were the case, that still wouldn't link back to the university. So there's no evidence of a causal connection between any stigma and the university's actions here. And you think that's a standing argument, not a merits argument? I think it's both. And I think that in the establishment clause, and actually in the free exercise front, the standing arguments are pretty closely linked to the merits piece. There's additional components to the merits analysis as well. We have the history and burden that plaintiff must carry, but yes, there's definitely an overlap between standing and merits on both of those religious complaints. Counsel, your argument, as I understand in response to Judge Freeland's question, was that after a full trial on the merits, we have to view the evidence in the light most favorable to the district court's decision. The fact that the plaintiff so testified does not mean the district court had to find them credible or even give it much weight in assessing all the other evidence that it considered in making its factual finding that there was no evidence of discrimination or stigma attributable to the university from the policy. Isn't that your point? I think that's correct, Your Honor. And I point out that the district court's analysis on the standing side, it did not hold plaintiff to his burden of coming forward with evidence at trial. The district court simply reiterated that it had previously found at the pleading stage that there was an allegation of stigma and didn't require evidence, which is the burden that the district court should have held the plaintiffs to that. But then found that after listening to all the evidence that they didn't meet their burden to show either standing or an Establishment Clause violation. On the Establishment Clause piece, the district court found standing and then interjudgment on the merits. On the merits, okay. And our contention is that this court could do either. Either route would be appropriate. By that, I mean the court could find a lack of standing. The court could find that could affirm on the merits. Or I mean, a third alternative would be the court maybe could assume standing and proceed to the merits, but that has its own problems doing that. Yes, that is the third alternative. I would like to address the question of vagueness. And unless there are further questions on standing, I will. Actually, there is some information I'd like to discuss about standing. Because we've heard this contention that Kumar is worried about attendance at religious festivals or about talking about his Hindu faith. That's not sufficient because that sort of conduct is not something that's governed by the policy. As Judge Friedland's question acknowledges, the policy in a sense is quite modest. It protects a lot of protected categories, but it extends only to the educational and employment setting. So there needs to be some materially adverse action taken against a student or a faculty or a staff member in order for the policy to come into play. The harassment inquiry is likewise limited. It's not just any form of harassment. It's harassment that's so sufficiently severe or pervasive that it's going to have a materially adverse impact on the educational experience or the employment experience. And I think that my use of language there was a little bit imprecise in describing the policy, but that policy is in the record. And it's not across the board, all behavior is regulated. It's really only the employment and educational context. Is there a likelihood of confusion to a person of ordinary intelligence based on the inclusion of the term caste in this policy? That's something that needs to be proved at trial through evidence. And we don't have any survey evidence here indicating that anyone was confused. There's been no declarations from any students or faculty saying they're confused. They don't know what this means, so they don't know how to behave. There's no declarations even from plaintiffs indicating they don't know what caste means. And in their own advocacy efforts, they would consistently use the term caste and not define it. They knew what it meant. The problem here is that plaintiffs are offended by the policy. They don't like the policy. The problem is not that they don't understand the policy, which is fatal to the due process vagueness claims. Again, the vagueness claims should be looked at in context. This isn't a all-across-the-board ban on caste discrimination. It's limited to that educational context. And in that context, it's very understandable how you need to behave. You cannot give a student a poor grade because of their caste. You cannot recommend against hiring a faculty member because of their caste. These are the sorts of decisions that, in the context of the policy, any person of ordinary intelligence should understand. I have a question about thinking about the due process argument and the vagueness. So, if these categories of speech are not protected anyway, like harassment and discrimination say that the general category is not protected, is there an argument that within that category, a particular kind of discrimination can't matter because the whole category is not protected anyway? Like, even if there's vagueness around some subcategory, it doesn't matter? Well, you can clearly discriminate. You can discriminate on people based on the quality of the paper that they write, right? That's a form of discrimination that we want there to be distinctions on. What we don't want to have is discrimination based on and caused by certain specified protected categories. So, it's essential that those be listed, named, and what happened here was... I mean, this is a subcategory of race, though, the way it's written, right? So, if you can't discriminate or harass based on race, does it matter within race whether we exactly what the subcategories are? Yes, I think it's important as a illustration and clarification. And the analogy that I think of here is it's long been the law in California that you can't discriminate based on race, but the legislature nonetheless made an addition that said you can't discriminate based on certain hairstyles that are associated with race. So, the Afro would be the classic example, or dreadlocks, right? Was it already there? Yes, it was already implicit in the statute, but calling it out helps it make it more understandable. And the other quality that you... Say it didn't help. Say it doesn't help. Is that a due process problem? My point is, if you already know you can't discriminate against race, and then you add something about racial hairstyles, and then people don't understand what the hairstyle issue is, does that actually make it vague that you can't discriminate against race? I'm not sure I understand the hypothetical because in that instance, it seems to be something that would add additional clarity. And we have our linguist from USC, Camille Rich, and what she said in her expert report is that calling out through incremental change in a statute and saying, you know, it's not just sex discrimination, we're going to specifically name now pregnancy. And in California, we also name, for example, breastfeeding, right? Was that implicitly there already? Yes. Is it helpful to add that information? Camille Rich, the only testimony on this point is it actually adds clarity to the statute to be specifying terms in that way. I am nearing the end of my time. Are there any other questions that the court has? It looks like no. So we could turn to our three minutes for rebuttal. Yes. Sorry, go ahead. We'll submit. Thank you. And we'll submit. Thank you. Thank you. Thank you, Your Honor. To address the standing issue for the due process claim, I say we need to start with the proposition that this court articulated in Tingley. And that's, quote, the unique standing considerations in the First Amendment context tilt dramatically toward a finding of standing when a plaintiff brings a pre-enforcement challenge. That's 47 F. 4th 1066. That's what this was. This was a pre-enforcement challenge to the policy. So what the courts and yes, there was a trial on the briefs. So I think there was a lot of of what testimony the district court heard. It was through depositions and other things. And in that situation on the standing issue, as the U.S. Supreme Court held in Easley versus Cromartie, that where the evidence in the case is largely expert reports and documents and extensive review is required. And I would suggest the same extensive review is required here of the district court's findings. The district court, with regard to the standing issue, the district court heard, as we lay out in our papers, we meet all of the prongs of the standing argument, of the standing test for a pre-enforcement challenge. And we spell that out in our papers. I don't want to belabor the point here. Counsel, who were your witnesses other than the plaintiffs and the university officials who were deposed? Those were the only witnesses, Your Honor. So we don't have any expert testimony here? No. And so if we take, we don't, Your Honor, but if we take the vagueness issue, okay, just the vagueness issue for just a moment, neither Ms. Anson nor the experts could determine what or could come up with one definition of what C.A.S.T. meant. In fact, the defendant has provided at least two different definitions of C.A.S.T. One in the motion for judgment on the pleadings and another via Ms. Anson. Dr. Rich, who opposing counsel had mentioned, testified that when you ask her what C.A.S.T. means, she's a little bit short of rudderless, was the way she defined it, or the way she explained her inability to define C.A.S.T. If CSU can't define the term, how can they enforce discrimination or harassment claims when they're based on C.A.S.T.? I mean, that leads to the exact type of arbitrary enforcement. Is there any evidence in the record that the policy has been enforced at all since it was enacted? No, Your Honor. At the time, it was a brand new policy. I don't know if it's been enforced, but again, I don't think that matters under the circuit's law. This is a pre-enforcement challenge, and of course, we're entitled to bring such a challenge. And I would argue, and I know my time is just about up, but one thing I would argue is if Ms. Anson can't define C.A.S.T. or if she defines C.A.S.T. a certain way and the experts define C.A.S.T. another way or they can't define it at all, one of plaintiff's experts said the definition in the dictionary isn't even right. So we don't need an expert to show that the term is vague. We can just rely on defendant's experts and Ms. Anson, none of them come up with the same definition of C.A.S.T. If it's meant to be social status, if it's meant to be economic status, those are neutral terms to say those words. Those are words that we all have in our lexicon. Those are words that could have been used. That's not the words they used here. They use the word C.A.S.T. It is a loaded term for the reasons we explained. And I know I'm a minute over my time. I apologize for going beyond. Thank you, Your Honor. Thank you both sides for the helpful arguments. This case is submitted.
judges: TALLMAN, FRIEDLAND, BENNETT